Avon Products, Inc., Respondent, v Sheldon H. Solow, Doing Business as Solow Building Company, Appellant.

First Department, February 5, 1981

#### APPEARANCES OF COUNSEL

*Joel M. Miller* of counsel *(Martin D. Edel, Robert J. McDonald* and *Arline Mann* with him on the brief; *Sullivan & Cromwell* and *Ullman, Miller & Wrubel, P. C.,* attorneys), for appellant.

*Herbert M. Wachtell (Peter D. McKenna, Claude M. Tusk* and *Richard B. Skaff* with him on the brief; *Wachtell, Lipton, Rosen & Katz,* attorneys), for respondent.

#### OPINION OF THE COURT

Ross, J.

A narrow issue is presented for our review—whether the wage rate arbitration clause contained in the lease between these parties is sufficiently comprehensive in scope as to require arbitration where the defendant landlord adjusts his method of calculating the wage rate for certain building personnel, resulting in an increased rental to the

plaintiff tenant. We conclude that this issue is a proper subject for arbitration.

The plaintiff and defendant entered into a multiyear lease whereby the plaintiff now rents approximately 45% of the available rental space in defendant's prestigious building. The controversy in which these parties are now embroiled finds its genesis in article 7 of this lease which provides for a rental increase if there is a corresponding wage increase for porters and cleaning women. However, the wage rates of these personnel are determined by a collective bargaining agreement to which neither the landlord nor the tenant is a party. Once the subject wage rates are contractually established, it is incumbent upon the landlord to calculate the impact these rates will have on the lease between plaintiff and defendant.

Section 7.01 of the lease provides, in pertinent part, that: "The Wage Rate shall include but not be limited to sums paid for pensions, welfare funds, vacations, bonuses, social security, unemployment, disability benefits, health, life, accident and other types of insurance * * * The Base Wage Rate shall mean the Wage Rate in effect on December 31, 1969." Under this all inclusive definition, it comes as no surprise that since 1972 to the present, the "Wage Rate" has always exceeded the base rate, thus requiring a recomputation in the rent to be paid. In calculating a rent increase the landlord must follow an established formula:

"If the Wage Rate shall be changed at any time after December 31, 1969, and shall be greater than the Base Wage Rate at any time(s) during the term of this lease, Tenant shall pay to Landlord as additional rent an annual sum equal to 1.10 times the product obtained by multiplying (i) the number of cents, by which the Wage Rate exceeds the Base Wage Rate by (ii) the number of square feet of rentable area of the demised premises. * * *

"Landlord shall give Tenant written notice of each change in the Wage Rate which will be effective to create or change Tenant's obligation to pay additional rent * * * and such notice shall contain Landlord's calculation of the annual rate of additional rent payable resulting from such change in the Wage Rate" (§ 7.02).

As mentioned above the wage rates for porters and cleaning women are established by a collective bargaining agreement and are expressed in hourly terms. However, fringe benefits are not similarly denoted. This integral part of the wage rates is provided for on a yearly or weekly basis. It is then necessary to translate the latter portion of the wage rates into the common denominator of hourly rates. During the years 1972-1979, the landlord translated the nonhourly fringe benefit rates into hourly rates by taking the benefits and, if they were expressed in annual terms, the landlord divided that amount of the benefit by 2,080 hours for the porters (40 hours per week times 52 weeks) and by 1,560 hours for the cleaning women (30 hours per week times 52 weeks). If the benefit was expressed in weekly terms, the landlord divided that amount of the benefit by 40 hours for the porters and 30 hours for the cleaning women. In addition, beginning sometime after 1972, the landlord began to divide vacation time by 2,000 hours for porters and 1,500 hours for cleaning women representing 40- and 30-hour work weeks respectively multiplied by 50 weeks rather than 52 weeks.

For the years 1975 through and including 1979, the tenant protested the wage rate escalation notices provided by the landlord. For the three-year period commencing with 1977, the tenant sought to arbitrate this increase pursuant to the wage rate arbitration clause contained in their lease. This provision provides in pertinent part: "Every notice given by the Landlord pursuant to Section 7.02 shall be conclusive and binding upon tenant unless (i) within 45 days after receipt of such notice Tenant shall notify Landlord that it disputes the correctness of the notice, specifying the particular respects in which the notice is claimed to be incorrect, and (ii) if such dispute shall not have been settled by agreement, shall submit the dispute to informal arbitration pursuant to Article 33 within 90 days after receipt of the notice." It is interesting to note that even though the tenant sought to arbitrate the change in wage rates for three years, to date these proceedings have not commenced.

By notice dated February 1, 1980, landlord provided tenant with the first notice of a change in wage rates for

1980 and the landlord's calculation of additional rent payable. It is this first 1980 notice which constitutes the subject of this appeal. The 1980 increase, according to this notice, was the result of a wage increase negotiated for the porters and cleaning women. Additionally, landlord notified tenant that he, the landlord, had adjusted the method of determining the hourly rate for fringe benefits by dividing the benefits by the hours actually worked. Now, instead of using the annual figure of 2,080 hours for porters and 1,560 hours for cleaning women, the landlord used the figures of 1,657 for porters and 1,221 for cleaning women. Similarly, the landlord divided the base wage rate by actual hours worked in the 1969 base year.

Tenant timely protested this latest notice and demanded arbitration. Simultaneously, tenant also commenced an action at law against the landlord concerning the 1980 wage escalation notice. Both the action at law and the demand for arbitration challenge the propriety of the landlord adopting a new method of calculating the hourly rate for fringe benefits.

Tenant moved to stay its own demand for arbitration on the grounds that the causes of action set forth in the complaint are "justiciable and not arbitrable." Landlord countered by moving to stay the action at law and permit the arbitration to proceed. Special Term denied the landlord's motion to stay the law action and we now reverse this determination.

The landlord's 1980 adjustments, in which he utilized a novel approach, is an appropriate issue for arbitration as stipulated by the lease voluntarily entered into between these parties. Article 7 of the document defined wage rates to include fringe benefits and is silent as to any approved method in determining how to translate fringe benefits into hourly rates. If these rates escalated for whatever reason, the landlord was obligated to notify the tenant and include in this notice the calculations upon which this increase was based. If there was a dispute, arbitration was the elected forum. Since the wage rates were negotiated through a collective bargaining process, a matter in which these parties had no input the only dispute that could arise

would center around the landlord's calculations thereof. Therefore, under the lease agreement a change in landlord's method of calculation of the wage rate is a change in the wage rate which may be challenged only through arbitration. The agreement to arbitrate is thus "express, direct, and unequivocal" *(Gangel v DeGroot,* 41 NY2d 840, 841).

It is well established that the tenant, who is now assailing this provision, has on prior occasions indicated that arbitration is the preferred forum. In fact it is the only forum in which tenant has previously attempted to resolve disputes pertaining to the translation of fringe benefits into hourly rates. This fact is accorded little attention by our dissenting colleague. The dissent argues that the increased rent is based upon adoption of a new formula for the computation of the wage rate, and since tenant never specifically agreed to arbitrate that individual issue, it cannot be required to arbitrate at all. The record indicates that the provisions of the lease do not discuss how the landlord is to convert fringe benefits into an hourly rate. In addition to no formula being set forth, the tenant concedes that the landlord previously utilized two different methods of computation to translate the weekly and annual fringes into an hourly rate and that they (Avon) demanded arbitration on at least two occasions. The Court of Appeals recently held that: "Once the parties to a broad arbitration clause have made a valid choice of forum, as here, all questions with respect to the validity and effect of subsequent documents purporting to work a modification or termination of the substantive provisions of their original agreement are to be resolved by the arbitrator" *(Schlaifer v Sedlow,* 51 NY2d 181). When defendant previously attempted to recompute the rent, there was no question that arbitration was the sole forum in which to seek redress. To hold that a party has relinquished his right to litigate, it must be shown that the parties intended or contemplated the use of arbitration. We feel that the record amply demonstrates that the parties to this action so intended. Through the lease and through their prior course of dealings these parties have clearly demonstrated that they have "expressly agreed to

arbitrate their disputes" *(Schubtex, Inc. v Allen Snyder, Inc.,* 49 NY2d 1, 6).

One additional fact, and one which has been overlooked by the dissent, is that the parties to this lease are by no means neophytes in the business world. They have, through their years of collective experience, attained a certain degree of sophistication in the negotiation, drafting and implementation of lease agreements. They have, through the past decade, interpreted article 7 of the subject lease to be all encompassing. To suddenly contend otherwise would be tantamount to negating that business acumen which has been amassed. The past interpretation given this article need not be recast. Therefore, no reason exists why this issue, like the others preceding it, should not proceed to arbitration.

Accordingly, the order of the Supreme Court, New York County (WALLACH, J.), entered on August 28, 1980, which denied defendant's motion to stay this action, pending arbitration, should be reversed, on the law to the extent appealed from, with costs and disbursements, and the motion granted.

BLOOM, J. (dissenting). Defendant appeals from so much of an order as denied his application to stay this action pending arbitration. Defendant is the owner of the 50-story building located at 9 West 57th Street. By lease dated November 25, 1969, defendant let 21 floors in the building to plaintiff. That lease was subsequently amended on July 17, 1970 to include four additional floors so that plaintiff is now the lessee of 25 floors occupying 678,990 square feet representing approximately 45% of the building's rentable space.

Defendant is a member of the Realty Advisory Board on Labor Relations, Inc. By consequence, it is bound by the collective agreement entered into between the Realty Advisory Board and Local 32B, Building Services Employees International Union, AFL-CIO. Pertinent to the action before us is article 7 of the lease which provides for the escalation of rents in the event of an increase in the wage rates of certain employees covered by the collective agreement. Section 7.01 defines wage rates of porters and

cleaning women to include, in addition to hourly wage rates, sums paid for pensions, welfare funds, vacations, bonuses, Social Security, unemployment, disability benefits, health, life, accident or other types of insurance. It also provides that the "Basic Wage Rate shall mean the Wage Rate in effect on December 31, 1969". Section 7.02 specifies, in part that "[i]f the Wage Rate shall be changed at any time after December 31, 1969, and shall be greater than the Basic Wage Rate at any time (s) during the term of this lease, Tenant shall pay to Landlord as additional rent" a sum computed in accordance with the provisions of the article. The landlord is required to give the tenant written notice of any increase in the basic wage and to set forth its calculation of the additonal rent payable. Under section 7.03 such notice is binding and conclusive upon the tenant unless, within 45 days after receipt thereof, the tenant shall notify the landlord that it disputes the correctness of the notice. In such event, the parties shall, by agreement, endeavor to compose their differences. Failing such agreement, the matter is to be submitted to "informal" arbitration.

The wages of porters and cleaning women are fixed by the collective agreement on an hourly basis. The peripheral benefits provided by the collective agreement are fixed on a weekly basis "for ever regular employee". Thus, in order to compute the hourly base wage it became necessary to reduce the weekly sums paid to the various funds to an hourly rate. Up to and including the 1979 wage escalations, the hourly wage rate was obtained by dividing the total annual wage payable to porters and the total annual peripheral benefits paid on their behalf by 1,680 (40 hours per week times 52 weeks) and cleaning women by 1,560 (30 hours per week times 52 weeks).[1] Many of the notices served by defendant were disputed by plaintiff and, in some instances, arbitration was demanded. None of these disputes has, in fact, proceeded to arbitration.

---

1. Commencing in or about 1972 this was amended to 2,000 hours per year for porters and 1,500 hours per year for cleaning women. This change was precipitated by defendant's recognition that although the lease provision (§ 7.01) permitted exclusion of vacation time in the computation of base wage, he had failed to exclude it.

In February, 1980 defendant served upon plaintiff a wage escalation notice. This notice, for the first time, computed the hourly wage for porters on the basis of annual work time of 1,657 hours and for cleaning women on the basis of annual work time of 1,221 hours. So that comparison with the basic wage rate would be fair, the base year, 1969, was recomputed on the same basis. The effect on plaintiff was startling. The recomputation alone affected an annual increase of $780,000 in its rent. Since the lease does not expire until July 31, 1997, this revision of the formula for computing the base wage would entail payment of some $13,500,000 in additional rent over the life of the lease.

The reason for the new denominator utilized by the defendant is indicated at the bottom of the 1980 escalation notice sent by defendant to plaintiff. A note provides that "[a]ll items, other than the minimum hourly rate, are calculated by dividing the total annual cost by the number of hours actually worked per year for both the base year and the current year".

Subsequent to the service of the 1980 wage escalation plaintiff brought this action. The complaint contains five causes of action. The first cause seeks a declaration that defendant is without power unilaterally to effect a change in the method of computing the annual number of hours worked by porters and cleaning women for the purpose of determining the amount of the wage escalation under article 7 of the lease. The second cause alleges a violation of the General Business Law while the third cause alleges a conversion of Avon's funds. Both seek compensatory and exemplary damages. The fourth cause seeks recoupment of the alleged excess rent paid by reason of the adoption by defendant of the new formula. The fifth and final cause seeks reformation of the lease. At or about the same time as the commencement of this action, plaintiff served upon defendant a demand for arbitration. In large part the demand tracks the complaint.[2] However, it contains additional claims which it concedes are within the ambit of the arbitration provision of article 7.

---

2. Plaintiff's asserted reason for seeking the same relief both in the courts and in arbitration is to protect itself against any eventuality.

Defendant moved to stay the action pending arbitration. Plaintiff moved to stay arbitration pending disposition of the action brought by it. Special Term denied defendant's motion to stay the action. It denied plaintiff's motion as academic. Only defendant has appealed from that determination. Hence, there is no need here to treat with the somewhat awkward situation posed by plaintiff's motion to stay an arbitration which it had inaugurated.[3]

Our law has long recognized the validity of an agreement to arbitrate *(Matter of Berkovitz v Arbib & Houlberg*, 230 NY 261; *Matter of Marchant v Mead-Morrison Mfg. Co.*, 252 NY 284). Prior to the enactment of the arbitration statute the remedy for breach of an agreement to arbitrate gave rise only to an action for damages *(Haggart v Morgan*, 5 NY 422). Indeed, a submission to arbitration could be revoked at any time prior to the final submission to the arbitrators for their decision even though a valuable consideration had been paid for waiver of the right to revoke. All that remained was the right of the aggrieved party to seek redress by way of damages *(Finucane Co. v Board of Educ.*, 190 NY 76).

The change came with the adoption of the Arbitration Law (L 1920, ch 275), now CPLR article 75. The covenant to arbitrate was made "valid, enforcible and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract". Thus, while an agreement to arbitrate is now specifically enforceable, it "is clear that unless the agreement to arbitrate expressly and unequivocally encompasses the subject matter of the particular dispute, a party cannot be compelled to forego the right to seek judicial relief and instead submit to arbitration" *(Bowmer v Bowmer*, 50 NY2d 288, 293-294; see, also, *Matter of Marlene Inds. Corp. [Carnac Textiles]*, 45 NY2d 327). "The agreement to arbitrate must be express, direct, and unequivocal as to the issues or disputes to be submitted to arbitration" *(Gangel v DeGroot*, 41 NY2d

---

3. Plaintiff concedes that despite the denial of its motion to stay the arbitration instituted by it, if defendant's motion to stay this action is denied, it is precluded from arbitrating any of the claims encompassed by the instant complaint.

840, 841). Of necessity, therefore, we are required to turn to the lease to determine whether the parties by their treaty agreed to submit to arbitration the issue of a new formula for the determination of the basic wage rate. Section 7.02 of the lease provides for additional rent "[i]f the Wage Rate shall be changed at any time after December 31, 1969, and shall be greater than the Basic Wage Rate at any time(s) during the term of this lease". Here, the escalated rent is not bottomed upon any purported change in the wage rate. Indeed, no claim to that effect is before us. The change is claimed to rest solely and exclusively upon the adoption by the defendant of a new formula for the computation of the wage rate. Plaintiff never agreed to arbitrate that issue.[4] In the absence of such an agreement, it may not be compelled to forego its right to litigate the question in the judicial forum.

Accordingly, and to the extent appealed from, I would affirm the order of Special Term.

KUPFERMAN, J. P., and SULLIVAN, J., concur with ROSS, J.; BLOOM, J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered on August 28, 1980, reversed, on the law to the extent appealed from, and the motion for a stay pending arbitration, granted. Appellant shall recover of respondent $50 costs and disbursements of this appeal.

---

4. The original formula for computation of the increased rent was, apparently, the product of an agreement by acquiescence. We are not told whether plaintiff acquiesced in the formula adopted by defendant in or about 1972. In any event, we need not concern ourselves with the method whereby the formula for increased rent was to be adopted or whether it is subject to change, other than to note that the parties have *not* by the lease agreed to arbitrate that issue.